IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

FAIR HOUSING OPPORTUNITIES
OF NORTHWEST OHIO, etc., et al.,
                    Plaintiff,         Case No. 3:06 CV 1329
      -vs-
                                               MEMORANDUM OPINION
AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, et al.

                    Defendant.
KATZ, J.

This matter is presently before the Court on the Report and Recommendation (R&R) of the Magistrate Judge (Doc. 174), recommending that the Defendants' motion for summary judgment (Doc. 115) be granted in part and denied part; recommending that Defendants' motion to strike the rebuttal reports (Doc. 155) of Plaintiffs' experts German and Bradford be granted; and recommending that the Defendants' motion to strike the declaration of Keith Foster be granted in part and denied in part. Both the Defendants (Doc. 186) and the Plaintiffs (Docs. 184, 185) have filed objections to the R&R.

In accordance with *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) and 28 U.S.C. § 636(b)(1)(B) & (C), the Court has made a *de novo* review of the record, applicable law, and the nearly 300 pages of briefing filed in connection with the aforementioned motions. For the reasons that follow, the R&R will be adopted insofar as it recommends granting the Defendants' motion for summary judgment, granting the motion to strike the rebuttal reports, and granting the motion to strike the Foster Declaration in part. It will be rejected insofar as it recommends denying the Defendants' motion for summary judgment. The Defendants' motion for summary judgment (Doc. 115) will thus be granted in full.

**I. Background**

One problem confronting low-income African-American neighborhoods is that property values are frequently so low that the market value of a home is less than the cost of building a new home of like quality at the same site. This case tests whether underwriting rules that seek to limit the moral hazard associated with selling replacement-cost homeowners insurance policies in such neighborhoods are valid under the Fair Housing Act (FHA), 42 U.S.C. §§ 3604-3605.

*A. The Parties*

At present, there are two Plaintiffs in this action.[1] The Toledo Fair Housing Corporation (TFHC) is a nonprofit corporation operated by Fair Housing Opportunities of Northwest Ohio. It seeks to identify and eliminate unlawful housing discrimination, educate the public about housing discrimination laws, and provide counseling and referral services with respect to housing opportunities. Eva White is an African-American who owns and resides in a dwelling in a predominantly African-American neighborhood in Toledo, Ohio.

The Defendants are American Family Mutual Insurance Company and its subsidiary, American Family Insurance Company (collectively "AFI"), for-profit corporations that insure homeowners in the Toledo area, and several of AFI's Toledo agents.

In this action, Plaintiffs assert two theories of recovery under the FHA. They claim that AFI's underwriting guidelines have a disparate impact on minorities. They also claim that they were subject to disparate treatment on the basis of race by AFI and its agents.[2] The Court will

---

[1] In a previous memorandum opinion (Doc. 104), this Court granted Defendants' motion for partial judgment on the pleadings (Doc. 58) and dismissed Eric Hawthorne as a plaintiff in this action.

[2] (continued...)

2

briefly summarize the factual background for both claims as they stand at this stage of the litigation.

*B. The Underwriting Practices at Issue*

Plaintiffs' disparate impact claim involves AFI's use of a dwelling's market value-to-replacement cost (MRC) ratio as an underwriting criterion.

AFI uses a dwelling's MRC ratio in determining the amount of insurance (AOI) that a homeowner may purchase. The "market value" in the MRC ratio represents an estimate of the price that the dwelling would sell for on the open market. The "replacement cost" represents the cost of replacing the destroyed building with one of like construction for similar use on the same premises. If a dwelling's MRC ratio is less than 40%, the insured is able to purchase an AOI that is 150% of the current market value of the dwelling. If the MRC ratio is between 40% and 50%, the insured can purchase an AOI that is up to 200% of the market value. For dwellings with an MRC ratio of 50% or higher, AFI caps the AOI at 100% of the replacement cost. So, for example, if the MRC ratio is 51%, the insured can purchase an AOI that is up to 196% of the market value.

The MRC ratio also determines what type of homeowners insurance an insured may obtain. AFI offers six different forms of homeowners insurance: Homeowners Form 1 (HO-1), Homeowners Form 2 (HO-2), Homeowners Form 3 (HO-3), Custom Value Form 1 (CV-1), Custom Value Form 3 (CV-3), and GoldStar (GS). Nearly all homeowners policies sold in the

---

[2](...continued)
Plaintiff White also brings her disparate treatment claims under 42 U.S.C. §§ 1981 and 1982. For purposes of ascertaining the Defendants' liability, the distinction between the various statutes does not matter. *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007) ("The familiar *McDonnell Douglas / Burdine* analysis applies to federal housing-discrimination claims, whether they are brought under the FHA or 42 U.S.C. §§ 1981 or 1982."). For the sake of clarity, the Court will refer only to the FHA throughout this opinion.

Toledo area are of the HO-3, CV-3, or GS type. CV-3 policies are available to insure dwellings with MRC ratios of less than 40%; HO-3 policies are available to dwellings with MRC ratios of 40% or higher; and GS policies are available to dwellings with MRC ratios of 50% or higher. HO-3, CV-3, and GS policies are equally comprehensive in terms of the types of perils they cover. Each type of policy also provides for claim settlement on the basis of the replacement cost for the dwelling, subject to the amount of insurance purchased. But if the dwelling is not repaired or replaced on the same premises, the claim is settled on the basis of the dwelling's market value.

Finally, it should be noted that only a small percentage of homeowners claims are for total losses. Instead, the vast majority of homeowners claims involve partial losses of less than 60%.

## *C. Plaintiff Eva White*

In October 2005, Eva White called AFI's office on Central Avenue in Toledo, Ohio, and asked for a quote for homeowners insurance. After providing the address of her home, she was told that "the lady who takes care of that" was not in, but would call back. After she did not hear back in a week, White called again. The same woman answered and, after putting White on hold, told White that AFI was "just very, very picky about the houses they insure." After White told the woman that she had a "brand-new furnace and a brand-new roof", the woman told White that she would see if she could "get somebody out there." White never heard from that office again.

White called another AFI office on Reynolds Road, but was informed that this office could not help her because she had already contacted another AFI agent. After contacting the TFHC, White eventually obtained homeowners insurance through the Brooks Insurance Agency and the Ohio Fair Plan.

## **II. Standard of Review**

Pursuant to Fed. Rule Civ. P. 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, a court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, a court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

**III. Discussion**

*A. Disparate Impact Claim*

In considering disparate impact claims against private defendants under the FHA, courts within the Sixth Circuit utilize the following variant of the *McDonnell Douglas* burden-shifting framework. First, "a plaintiff must make a prima facie case of discrimination by identifying and challenging a specific housing practice, and then showing an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Metro Human Relations Comm'n*, 508 F.3d 366, 373 (6th Cir. 2007) (internal quotation marks and citations omitted). Second, if the plaintiff successfully makes out a prima facie case, the defendant must offer a "legitimate business reason" for the challenged practice. *Id*. Third, "if the defendant offers such a reason, the plaintiff must demonstrate that the defendant's reason is a pretext for discrimination, or that there exists an alternative housing practice that would achieve the same business ends with a less discriminatory impact." *Id*.

5

**1. Prima Facie Case**

Plaintiffs' theory of adverse effect contains the following steps: African-American neighborhoods disproportionately contain older, lower-valued dwellings. A comparatively greater percentage of the policies AFI writes in African-American neighborhoods are thus CV-3 policies. But due to AFI's underwriting practices, homeowners with CV-3 policies cannot purchase an AOI that is equal to the replacement cost of their dwelling.

From these premises, Plaintiffs make the following argument: "Since the proceeds from a [CV-3] policy will not be sufficient to rebuild the home in the event of a total loss, the insured will likely be forced to abandon the site, leaving the house vacant or boarded up, resulting in a synergistic effect of increased crime, plunging market values, lower tax revenues, loss of city services, inferior schools, general urban blight, and an ever-increasing concentration of the poorest of the poor in these neighborhoods." (Doc. 149 at 23). In this way, Plaintiffs argue, "AFI is intentionally setting up minority communities for urban blight." *Id.*

The problem with this argument, however, is that it is not supported by "statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." *Graoch Assocs.*, 508 F.3d at 373. To be sure, AFI has submitted sufficient evidence to show that a comparatively greater percentage of the policies sold by AFI in predominantly African-American neighborhoods are CV-3 policies. See Doc. 155, Attachment 1 ("German Report"). But this alone provides no evidence of the "adverse effect in question": namely, the contribution of CV-3 policies to urban blight. See *Rocha v. Great Am. Ins. Co.*, 850 F.2d 1095, 1101 (6th Cir.1988) ("For statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to

6

permit an inference of discrimination.") (internal quotes and citation omitted). Plaintiffs simply provide no record evidence in support of their claim that AFI's insurance practices lead to greater rates of abandoned housing in minority neighborhoods. Indeed, Plaintiffs have been unable to point to a single instance where a house was forced to lie vacant due to the inability of the homeowner to afford to rebuild it. Instead, Plaintiffs offer only speculation as to the "likely effects" of the greater prevalence of CV-3 policies on these neighborhoods.

In finding that Plaintiffs had created a jury question on their disparate impact claim, the Magistrate Judge in her R&R pointed to the following evidence:

> (1) in 1996, an African American tester was not offered the Gold Star coverage afforded his/her white counterpart; (2) in October 2003, Defendant Guadarrama gave a quote to a white tester residing in a predominately white neighborhood without inspection and the black tester was given a verbal quotation for less coverage, (3) in 2004, an African American tester was quoted a price of $770, or $7.70 per thousand dollars worth of coverage and her Caucasian counterpart was offered an HO3 policy for $527 or $5.27 per thousand dollars worth of coverage, without an automobile rider, for an older property, (4) Mr. Moore did not obtain a quote for Gold Star coverage but a quote for HO coverage with endorsements (5) during October 2004, Plaintiff White was unable to obtain an oral quotation for insurance, (6) Deborah Smith was discouraged from considering Defendant AFMIC and (7) a white tester was given a quotation for replacement costs insurance while the black tester was given a quotation for a CV policy at a higher cost.

(R&R at 17-18). But the evidence cited by the Magistrate Judge is not statistical in nature, and does not relate to the adverse effect in question. Rather, it constitutes anecdotal evidence of disparate treatment. Indeed, Plaintiff TFHC candidly acknowledges that "[t]he [R&R] is confusing to the extent that the testing results are labeled as 'statistical evidence' supporting TFHC's disparate impact claim when the results relate more directly to the disparate treatment claim." (Doc. 189 at 13).

7

The Court is aware of no case sustaining a disparate impact claim solely on the basis of anecdotal evidence of a claimed adverse effect. As other courts have noted, "statistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir.2001). In the Sixth Circuit, relevant statistical analysis is required to make out a prima facie case of disparate impact discrimination. See *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (a prima facie case is established when plaintiff "through relevant statistical evidence proves that the challenged practice has an adverse impact on a protected group"); *Johnson v. U.S. Dep't of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994) (sustaining district court's dismissal of disparate impact claim because plaintiffs did not provide a "meaningful statistical analysis").

Thus, this Court cannot simply accept Plaintiffs' bald assertion that CV-3 policies have a significant detrimental effect on African-American neighborhoods in the absence of any supporting statistical evidence. Though the policies may not be sufficient to build a perfectly similar home in the event of a total loss, the policies do allow an insured to purchase an AOI that far exceeds the market value of the dwelling, allowing the insured to potentially build a more cost-effective home on site. Moreover, given that most homeowners insurance claims do not involve a total loss, a CV-3 policy will be sufficient to cover the overwhelming majority of potential claims. Finally, in the event that the insurance settlement from a CV-3 policy is not sufficient to rebuild on site, there has been no showing that housing is now so prohibitively expensive that the insured could not pay off an existing mortgage loan and obtain new housing elsewhere in the Toledo area. In that event, the former site may be redeveloped and sold to a new occupant, and the integrity of the neighborhood would not be affected.

For the foregoing reasons, the Court finds that the Plaintiffs have not made out a prima facie case of disparate impact discrimination.

**2. Business Justification**

Even if the Plaintiffs had met their burden of establishing a prima facie case, this Court would conclude that AFI has put forward a legitimate business reason for its use of the MRC ratio in underwriting insurance policies. Consideration of the MRC ratio advances an insurance company's important interest in identifying and limiting the moral hazard that might otherwise result from the provision of homeowners insurance.

In order to be profitable, an insurance company must be able to accurately identify and price risk. One long-recognized risk of providing insurance is the "moral hazard" that having insurance might create. As James Pearce, an economist who is also an expert witness for AFI, described it, "there is a diminution of incentive to maintain your property and to avoid risk if you have insurance coverage." (Doc. 138 at 40). In his report, Michael Miller, an actuary and expert witness for AFI, notes that "[i]n insurance terminology, moral hazard is broadly defined as any factor that increases the likelihood of claim occurrence because of acts of the insured." (Doc. 154, Appx. A ["Miller Report"] at 12).

The concept of "moral hazard" does not generally refer to risks created by the moral character of the insured. Rather, "[i]n the professional literature, moral hazard refers to the effect of insurance on the incentive of the insured person to prevent a loss. In economic studies of behavior, this incentive is regarded as being present for all individuals, and the focus of analysis is identifying attributes of insurance contracts that might restore the insured's incentive prevent losses." (Doc. 154, Appx. J. at 13-14).

9

Whenever the amount of a potential insurance recovery exceeds the amount that the policyholder could obtain for the insured item on the open market, there exists a financial incentive for the policyholder to file an insurance claim.  Miller calls this problem "over-insurance."  In economic terms, the value that an insured receives for an insurance premium payment is the security of not suffering a financial loss.  But in the case of over-insurance, the additional premium being charged for added coverage beyond the asset's value on the open market is not reflective of a financial risk being transferred.  Instead, the only way that an insured could benefit from paying this additional cost is if an insurance claim is actually filed.  In essence, purchasing insurance beyond an asset's value represents nothing more than a wager on whether the asset will be destroyed or not.  And at a certain point, the expected value of an insurance payout exceeds the risk of being caught.

The filing of an insurance claim in such instances, however, can have a significant distorting effect on rates and cause huge losses to the insurer.  As stated by Miller, "[o]ut of 100 homeowner insureds, there is hopefully no one that would actually destroy or damage their home for profit. But it would only take one insured to do so in order to more than double the number of total losses expected by [AFI] in its homeowners rate calculations," because AFI's rates are calculated on the assumption that only 1% of claims will be for total losses (Miller Report at 12).  Because the incentive to falsify an insurance claim in such instances is present in all individuals, the risk of the insured doing so is difficult to quantify.  For these reasons, insurance companies generally attempt to limit over-insurance.[3]

---

[3] As Miller notes, this is why automobile insurers will indemnify the insured only for a vehicle's (depreciated) market value, and not the cost of a brand-new automobile of similar make and

(continued...)

AFI's use of the MRC ratio as an underwriting criterion directly advances its interest in preventing over-insurance. With respect to replacement-cost homeowners policies, the MRC ratio measures the degree of discrepancy between the amount that the insured could receive for the home on the open market and an expected insurance payout. It thus provides a simple, objective way for AFI to measure the degree of risk created by over-insurance in the policies it provides. As Miller points out, AFI's CV-3 policies already permit a significant degree of over-insurance by allowing an insured to purchase an AOI that is up to 150% of his dwelling's current market value. But use of the MRC ratio allows AFI to cap over-insurance at a reasonable amount, and thus limits the losses AFI can be expected to incur from writing unprofitable policies. Additionally, not writing policies for dwellings with low MRC ratios might actually help preserve and protect low-income neighborhoods by reducing the incidence of insurance-motivated residential arson.[4]

Plaintiffs do not respond to AFI's proffered business justification with any expert actuarial testimony of their own. Instead, relying on the report of their own expert, Calvin Bradford, a sociologist, Plaintiffs broadly attack the entire notion of "moral hazard" as a legitimate underwriting consideration, claiming that the concept is inherently suspect and based on nothing more than "pure speculation."

---

[3](...continued)
model.

[4] Indeed, there is some evidence in the record that AFI's practice of permitting significant over-insurance already leads to large losses for the company. AFI's "Ohio Business Plan", prepared in 2002, notes that the percentage of "large losses" (defined as property losses of over $50,000) was greatest by far among AFI's custom-value policies, where large losses constituted 38% of all losses incurred under those policies. (Doc. 130, Exh. 47 at 14).

It is difficult to credit these arguments.  In the wake of the recent financial crisis, "moral hazard" has become a pervading concern of policymakers and a consideration of widely-acknowledged importance. See, *e.g.*, David Sirota, *Moral Hazards for Democrats*, Salon.com, Dec, 11, 2009 ("Washington's favorite term these days is 'moral hazard.' Though this buzzphrase may seem like a complex and even intimidating idea, most of us, whether consciously or not, understand the principle because it's basic common sense"); Harvey Rosenblum et al, *Fed Intervention: Managing Moral Hazard in Financial Crises*, Federal Reserve Bank of Dallas Economic Letter, Vol. 3, No. 10 (October 2008) ("*Moral hazard*, a term first used by the insurance industry, captures the unfortunate paradox of efforts to mitigate the adverse consequences of risk: They may encourage the very behaviors they're intended to prevent.").  The concept's salience has been acknowledged by both the chairman of the Federal Reserve, see Ben Bernanke, *Reducing Systemic Risk*, Speech at the Federal Reserve Bank of Kansas City's Annual Economic Symposium (Aug. 22, 2008) (accessed at http://www.federalreserve.gov/newsevents/speech/bernanke20080822a.htm) (referring to "moral hazard issues"), and the President of the United States, see Barack Obama, Remarks on Financial Rescue and Reform (Sept. 14, 2009) (accessed at http://www.whitehouse.gov/the_press_office/Remarks-by-the-President-on-Financial-Rescue-and-Reform-at-Federal-Hall/) ("Those on Wall Street cannot resume taking risks without regard for consequences, and expect that next time, American taxpayers will be there to break their fall.").

This Court cannot slight an insurance company's important interest, from a standpoint of both public policy and business policy, in mitigating moral hazard risk.  The expert testimony presented by AFI in this matter leaves no doubt as to the genuineness of the moral hazard concern

12

presented by over-insurance and the direct contribution of the MRC ratio to identifying and reducing this risk. Therefore, the Court finds that AFI has advanced a legitimate business justification for its practice of using MRC ration as an underwriting criterion.

**3. Pretext**

In an apparent attempt to argue that the MRC ratio is a "pretext for discrimination," Plaintiffs (as well as the *amicis* brief) contend that "replacement cost" is more "objective" and less susceptible to manipulation than "market value." As the *amicus* puts it, "replacement costs are calculated relatively objectively," while "dwelling market values vary significantly throughout metropolitan markets, and are statistically correlated with neighborhood racial composition." (Doc. 172 at 15).

This criticism rings hollow, however. Anyone who has paid residential property taxes is familiar with the concept of "market value" and the well-accepted appraisal practices by which a home's market value is measured. Far from being an infinitely malleable concept, as Plaintiffs contend, a dwelling's market value may be easily measured by looking to the recent selling prices of comparable homes. It is true that market value captures the subjective preferences of consumers and hence is more "arbitrary" in that sense. But market value is not "arbitrary" in the relevant sense: it represents information of clear importance to a legitimate business interest of insurers, and may be ascertained through objective measures. It is not clear, indeed, why "replacement cost" would not be equally susceptible to manipulation by an unscrupulous insurance agent. Therefore, the Court finds that Plaintiffs are not able to carry their burden of demonstrating that AFI's use of the MRC ratio is a pretext for discrimination.

**B. Plaintiff White's Disparate Treatment Claim**

13

To make out a prima facie case of disparate-treatment housing discrimination under the FHA, a plaintiff must show: "(1) that he or she is a member of a racial minority, (2) that he or she applied for and was qualified to rent or purchase certain property or housing, (3) that he or she was rejected, and (4) that the housing or rental property remained available thereafter." *Mencer v. Princeton Sq. Apartments*, 228 F.3d 631, 634-5 (6th Cir.2000).

In this case, White concedes that she never applied for homeowners insurance from AFI. Instead, she argues that applying for insurance from AFI would have been a "futile gesture" and her failure to apply is thus excused. The "futile gesture" doctrine requires satisfaction of the following elements: "the plaintiff must be a member of a racial minority who was a potential bona fide buyer of the property and financially able to purchase it at the time it was offered for sale; the owner discriminated against people of the plaintiff's race; the plaintiff was reliably informed of this policy of discrimination and would have taken steps to buy the property but for the discrimination; and the owner would have discriminated against the plaintiff had the plaintiff disclosed an interest in the property." *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990).

To invoke the "futile gesture" doctrine, then, White must produce evidence that her interest in purchasing homeowners insurance was cut short by "actual knowledge" of the defendant's discriminatory practices. *Darby v. Heather Ridge*, 806 F.Supp. 170, 174 (E.D. Mich. 1992). White cannot meet this burden, because she presents no evidence that she had "actual knowledge" of a discriminatory policy of AFI's at the time she sought homeowners insurance. Indeed, the evidence indicates that AFI had no such policy. According to Plaintiff's own expert, AFI issued 61 homeowners policies in White's neighborhood and 1,492 policies in Toledo

14

neighborhoods with a greater than 50% African-American population between 1999 and 2007. (See German Report, Exh. F at 3). Thus, White cannot carry her burden of showing that applying for homeowners insurance from AFI would have been a "futile gesture".

The case of *Steptoe v. Savings of America*, 800 F.Supp. 1542 (N.D. Ohio 1992), is readily distinguishable. In that case, the plaintiffs had applied for a home loan but withdrew their application after the defendant "purposefully lowballed" them in its appraisal of the value of their home. The defendant argued that the plaintiffs could not make out a prima facie case of discrimination because their loan application had never actually been rejected. Holding the lack of a rejection excused, Judge Walinski reasoned, quite sensibly, that otherwise "[a] potential defendant in an FHA case could always insulate itself from liability . . . by purposefully lowballing an appraisal and then doing nothing more." *Steptoe*, 800 F.Supp. at 1546. Thus, an FHA plaintiff need not show that her application has actually been rejected when the defendant has made clear through its own intentional conduct that it will only contract with the plaintiff on drastically unfavorable terms.

*Steptoe* stands for nothing more than the proposition that an FHA plaintiff need not actually go through with a bad bargain in order to assert an FHA claim. Its reasoning is not applicable to cases where the plaintiff does not even submit an application, much less cases where a plaintiff has no reason to believe that the defendant employs a discriminatory policy. Therefore, White's disparate treatment claim must be dismissed.

**C. Plaintiff TFHC's Disparate Treatment Claim**

In its Objection, TFHC said that it "does not object to the [R&R] and generally urges its adoption by the Court subject to a single clarification concerning the Magistrate's resolution of

15

Defendants' Motion to Strike Rebuttal Reports by Plaintiff's Experts."[5] (Doc. 184 at 1). The R&R recommended that "the issue of disparate impact be resolved at trial" (Doc. 174 at 18) and summary judgment granted as to the remaining claims (*Id.* at 22). Thus, this Court finds that TFHC has waived any disparate treatment claim of its own.

In the Complaint, TFHC alleged that it had suffered injury in its representative and organizational capacity. (Doc. 1 at ¶¶ 43-44). The Magistrate Judge, however, only analyzed TFHC's disparate treatment claims as they specifically related to White. This was understandable. The only other individual specifically mentioned by TFHC in connection with its representative-capacity disparate treatment claim was Eric Hawthorne, whose individual claims have been dismissed from this action. See Doc. 149 ["Plaintiffs' response brief"] at 35-40.[6] Moreover, because Plaintiffs' response brief did not address Defendants' argument that TFHC lacks proof of any organizational injury (see Doc. 115 at 21-22), there was no reason for the Magistrate Judge to consider TFHC's organizational claims.

---

[5] The "single clarification" requested by TFHC is that this Court make clear that Defendants' motion only sought to strike the rebuttal reports of Plaintiffs' experts (see Doc. 149, Exhs. 1 & 2), and not their initial expert reports. Defendants do not dispute this point. With that clarification, neither TFHC nor Eva White objects to the Magistrate Judge's recommendation that Defendants' motion to strike the rebuttal reports as untimely (Doc. 155) be granted. Therefore, Defendants' motion to strike (Doc. 155) is granted, and the rebuttal reports of Bradford and German (Doc. 149, Exhs. 1 & 2) are stricken from the record. In any event, the Court has reviewed the rebuttal reports, and their admission would not change the Court's analysis.

[6] The Plaintiffs did refer generally to evidence from paired testing studies conducted by TFHC, but only to argue that such evidence was admissible as an evidentiary matter. (Plaintiff's response brief at 39-40). Notably, Plaintiffs did not attempt to respond to Defendants' argument that the paired testing results did not indicate disparate treatment. (Doc.115 at 25-27). It is also notable that TFHC's response to the Defendants' Objections mentions the disparate treatment claim only in passing.

It has long been settled that a party must make "specific objections to the magistrate's report" in order to preserve an issue for subsequent district court or appellate review. *Smith v. Detroit Fed'n of Teachers Local 321*, 829 F.2d 1370, 1373 (6th Cir. 1987). "[M]aking some objections but failing to raise others will not preserve all the objections a party may have." *Id*. In light of the foregoing, the Court finds that TFHC has acquiesced in the Magistrate Judge's recommendation that its disparate treatment claim be dismissed.

**D. Motion to Strike the Declaration of Keith Foster**

The Defendants have filed a motion (Doc. 156) to strike the Declaration of Keith Foster. (Doc. 149, Exh. 9). In opposing a motion for summary judgment, a party may only rely on evidence that will be admissible at trial. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). In the present case, the Court agrees with the R&R that paragraphs three, four, and six of Foster's declaration are "replete with hearsay and not based upon Keith Foster's personal knowledge." (R&R at 7). Though Defendants object that the entirety of Foster's declaration should be stricken, they do not provide any basis for striking the remaining paragraphs. Cf. *Giles v. University of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007) ("In resolving a motion to strike, the Court should use a scalpel, not a butcher knife.") (internal quotation marks omitted). Therefore, the Court agrees with the Magistrate Judge's recommendation that only paragraphs three, four, and six of the Foster Declaration be stricken.

**IV. Conclusion**

For the foregoing reasons, the R&R is adopted in part and rejected in part. Therefore, Defendants' motion for summary judgment (Doc. 115) is granted. Defendants' motion to strike the rebuttal reports of Plaintiffs' experts (Doc. 155) is granted. The Defendants' motion to strike

17

the declaration of Keith Foster (Doc. 156) is granted as to paragraphs three, four, and six, and denied otherwise. Case closed.

      IT IS SO ORDERED.

                                             s/ *David A. Katz*
                                            DAVID A. KATZ
                                            U. S. DISTRICT JUDGE